AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

|  |  |  |
|---|---|---|
| Scott Joseph Petinga | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | Civil Action No. |
| v. | ) | |
| Timothy James Walz, in his official capacity as | ) | |
| Governor of Minnesota | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Timothy James Walz, in his official capacity as Governor of Minnesota
130 State Capitol
75 Rev Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____

*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SCOTT JOSEPH PETINGA | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| - against - | ) CIVIL ACTION NO. 21-CV-727 |
| | ) |
| TIMOTHY JAMES WALZ, in his official | ) |
| capacity as Governor of the State of | ) |
| Minnesota, | ) |
| | ) |
| Defendant. | ) |

COMPLAINT FOR DECLARATORY RELIEF

For his Complaint, Plaintiff alleges as follows:

Nature of the Action

1.     Minnesota's statutory scheme awarding spousal maintenance is unconstitutional.

2.     The ability to marry, to end a marriage, and to remarry are fundamental rights. No State law may interfere with or burden these rights unless the law is necessary to promote a compelling State interest and is the most narrowly drawn means of achieving that interest.

3.     Minnesota's statutory scheme concerning spousal maintenance burdens the right to end a marriage and to remarry. Minnesota subjects its citizens to the unfettered discretion of the judiciary to impose spousal maintenance, the amount of which is subject to the limitless discretion of the court, and may be increased at any future time after the parties are divorced if the payer's income or wealth increases, or the court's perception of the recipient's "need" increases.

4.      Minnesota has no compelling interest in this process, as evidenced by the facts that there is no statutory right to spousal maintenance, that most divorce judgments do not include spousal maintenance, and that, when the divorcing parties agree to forego spousal maintenance, the court is powerless to impose it.

5.      Spousal maintenance is unrelated to the need to provide for minor children of divorce, a need addressed by Minnesota's statutes governing child support awards and the division of marital property between divorcing spouses.

6.      Spousal maintenance is an historical anachronism, a remnant from an earlier legal era when the rights of women vis-à-vis their husbands, and in society in general, were radically different than they are today.

7.      Minnesota's spousal maintenance scheme is unconstitutionally vague, giving no notice to citizens contemplating marriage or divorce what fate may befall them in a divorce proceeding. The Legislature, by failing— among other things—to identify the quantitative means or metric by which it decides whether and what measure of spousal maintenance should apply, has delegated basic policy decisions to the judiciary without any meaningful guidance.

8.      Therefore, Plaintiff seeks a declaratory judgment that the relevant Minnesota statutes— §518.552, in particular— are void as a violation of the Fourteenth Amendment to the United States Constitution.

<u>Parties</u>

9.      Plaintiff Scott Joseph Petinga is a resident of Minnesota, currently in post-dissolution action in Minnesota District Court, Judicial District of Hennepin, for, inter alia, downward modification of spousal support.

10.    Defendant Timothy James Walz is the Governor of Minnesota. He is sued in his official capacity only.

Jurisdiction

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

Relevant Facts

13.    A citizen's decisions concerning marriage, divorce, and remarriage are essential to fundamental liberty. They are at the core of personal privacy and integrity. They are often at the core of other decisions involving child bearing and child rearing.

14.    The decision to end a marriage and perhaps to remarry are among the most intimate and personal choices a person may make in a lifetime, and are central to personal dignity and autonomy.

A.  Marriage and Remarriage in Minnesota.

15.    Minnesota maintains a state monopoly over marital status—over both marriage and the end of a marriage.

16.    Citizens wanting to be recognized as married in Minnesota must marry in a way that satisfies Minnesota's statutory scheme.  Minn. Stat. §§ 517.01-23.

17.    Minnesota does not recognize common law marriage (marital status resulting from long-term cohabitation, mutual agreement, and sharing of income and assets).

18.    Religious marriage ceremonies are not recognized as valid by Minnesota unless the ceremony is performed by a person empowered by Minnesota to officiate at weddings and is otherwise in accordance with Minnesota law. *Id*.

19.     If Minnesota asserts jurisdiction over a marriage, the spouses are powerless to end their marriage without a final judgment from a court. If the parties divorce in Minnesota, the court also has exclusive power to fix and enforce the terms under which the marriage will be ended.  Minn. Stat. §§ 518.001, 518.002, 518.003, 518.005, 518.01, 518.02, 518.03, 518.04, 518.05, 518.055.

20.     If Minnesota exercises jurisdiction over a marriage, the parties to that marriage are not free to marry someone else without first obtaining a judgment of divorce ending the existing marriage.  Bigamy is a felony in Minnesota. Minn. Stat. § 609.355.

21.     Because remarriage is illegal without a divorce, and because divorce (unlike marriage) requires a judicial judgment, unless the parties are able to agree on every aspect of their post-marital relationship, divorce, as a practical matter, requires that each spouse retain an attorney.

22.     As discussed below, because Minnesota law establishes matrimonial courts as roving inquisitorial bodies with essentially limitless powers of inquiry, coercion, and punishment, divorce actions are complex, protracted, invasive, and, because of the counsel fees required, very expensive.

B.  Divorce in Minnesota

23.     Divorce rates in the United States have been climbing steadily since at least 1860. Between 1880 and 1890, the rate of divorce in the nation increased 70%, and then reached new heights in the 1920's. A significant number, and perhaps a majority, of marriages in Minnesota and in the United States now end in divorce. In 2000, almost 16,000 judgments granting a divorce were entered in Minnesota. Approximately one million couples divorce each year in the United States. One-fifth of all adults in the United States have been divorced at least once. The number of marriages that end each year in divorce is larger than the number that end in death.

4

24.     Until 1974, Minnesota permitted married couples to end their marriage only upon a judicial finding that one spouse (and not the other) had committed some act that constituted "fault," typically adultery, physical abuse, habitual drunkenness, or desertion.

25.     Through much of Minnesota's history, these grounds for divorce were also, independently, criminal acts punishable by imprisonment. When older cases and commentators refer to the "guilty party" in a divorce action, the term is to be understood in that context.

26.     Now, Minnesota permits spouses to obtain a judgment ending their marriage based on nothing more than the spouses' mutual desire to do so.

27.     Minnesota now permits parties to end their marriage if a court finds as a matter of fact that the marriage is "irretrievably broken." Minn. Stat. § 518.06. If the parties stipulate to this fact, then the court will not inquire further and a divorce will be granted.

28.     This change in the law reflected the fact that the State had no interest in forcing people to remain married, or in unduly burdening or interfering with their desire to end their marriage.

29.     Throughout the United States, the overwhelming majority of persons who divorce subsequently remarry. Half of all persons who divorce are remarried within five years.  One-third of all marriages today are remarriages (that is, at least one person in the couple has been previously divorced.) Indeed, the desire to remarry is frequently the motivation for the spouse seeking a divorce.

30.     A burden on the right to divorce is a burden on the right to remarry, which implicates rights of privacy under the 14th Amendment of the United States Constitution.

C.  Financial Aspects of a Divorce in Minnesota

31.     In granting a divorce, Minnesota's judiciary has the power to (a) award the spouses' property to either spouse; (b) require either spouse to pay to the other a sum of money denominated "child support" if there are children of the marriage; and (c) require either spouse to pay the other spouse spousal maintenance or "spousal support," i.e., periodic, fixed-sum payments, for as long as both spouses are living.

32.     When the matrimonial court allocates the spouses' property, it does so "equitably," which means it is not required to divide the property equally. If the court believes that one spouse "needs" or "deserves" a greater share of the marital estate, the court is free to rule accordingly. Minnesota expressly provides by statute that the court may award "all" of the property of both spouses to one spouse.

33.     In dividing the marital property "equitably," Minnesota courts are permitted to and do take into account the needs of minor children who will reside primarily with one parent.

34.     Definitive case law establishes that, in addition to these express statutory powers, Minnesota courts have essentially unlimited "equitable" and "inherent" powers to fashion remedies when dealing with the assets of the marital estate.

D.   Spousal Maintenance (also known as Spousal Support and/or Alimony) in Minnesota

35.     There is no right to spousal maintenance in connection with any Minnesota divorce.

36.     On information and belief, most Minnesota divorce judgments do not provide for spousal maintenance.

37.     On information and belief, spousal maintenance is requested and awarded in fewer than 20-percent of Minnesota divorces.

38.     Nonetheless, according to the Internal Revenue Service, throughout the United States, former spouses pay approximately $9 billion in spousal maintenance each year. That is larger than the gross national product of many nations.

39.     On information and belief, a majority of the cases in which an award for spousal maintenance is granted are subject to irrational, unjustified and arbitrary awards, which force the parties to continue litigation in the courts long after the divorce has become final.

a.     The Statutory Scheme Grants Courts Unfettered and Unguided Discretion

40.     Matrimonial trial courts in Minnesota have unfettered and effectively unguided discretion in awarding spousal maintenance – including deciding whether to award it at all, how much to award, whether there should be a durational limit on such payment, and what that limit should be.

41.     Minnesota statutory law identifies factors that the court must consider in setting spousal maintenance. They include: the length of the marriage, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties.  The court is further directed in awarding spousal maintenance to consider the terms of the divorce judgment concerning the division of the spouses' marital property. The court is also directed to consider, in the case of a parent to whom custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment.  Minn. Stat. §518.552 Subd. 1.

42.     Minnesota statutory law does not, however, state what weight, if any, the court is to give to each factor, and definitive case law holds that the court is free to assign to each factor whatever weight the court deems appropriate in any individual case (which weight may vary from case to case).

43.     Definitive Minnesota case law also advises trial courts that they need not state in

their written decisions what weight they gave any factor, or even what consideration they gave to any factor.

44.     Definitive Minnesota case law also holds that trial courts may in their discretion consider factors other than those identified in the statute.

45.     Trial courts are not required to calculate spousal maintenance with mathematical precision.

46.     Indeed, under the existing statutory scheme, no other ruling is possible because the Legislature has offered no meaningful metric as to how, when, or why spousal maintenance should be awarded or "calculated." For these reasons, meaningful judicial review of trial court awards of spousal maintenance is impossible.

b.     The Statutory Scheme Fails to Identify a Compelling Purpose of Spousal Maintenance

47.     Ever since the advent of no-fault divorce, it has been widely acknowledged among family law scholars that traditional spousal maintenance schemes such as Minnesota's had lost any remaining trace of intellectual or doctrinal legitimacy or coherence. While commentators have differed in their suggested solutions to this development, no learned observer maintains that schemes such as Minnesota's are defensible as matters of logic or policy.

48.     One observer described the problem as follows:

The advent of no-fault divorce and the demise of the state-imposed marriage contract significantly undermined [the] traditional rationales for spousal maintenance.

Because divorce no longer required a showing of fault or breach, a damage remedy seemed inappropriate. Similarly, because marital obligations were no longer officially gender-based, a spousal maintenance remedy premised on the husband's support obligation and available only to the wife seemed both anachronistic and discriminatory. Moreover, while the fault-based divorce system emphasized the importance of preserving the marital unit, the no-fault system focused on effectuating the desire of one or both spouses to end their

marriage. Without a societally imposed duty to continue the marriage, justifying financial obligationsthat survived divorce became problematic. Divorce reform thus left spousal maintenance in somewhat of a <u>theoretical vacuum</u>.

J. Singer, "Spousal maintenance and Efficiency: The Gendered Costs and Benefits of the EconomicJustification for Spousal maintenance", 82 <u>Geo. L.J</u>. 2423, 2424-25 (1993-94) (Emphasis added).

49.     Minnesota case law dating back to the pre-no-fault version of the statute states only that the primary purpose of spousal maintenance is the reasonable continuing duty of support. In fact, the current iteration of the spousal support statute vaguely stakes its purpose in two parts. First, "to provide for reasonable needs of the spouse considering the standard of living established during the marriage, especially but not limited to a period of training or education." Second, to provide "adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment" and "condition(s) or circumstances [that] make it appropriate that the custodian not be required to seek employment outside the home," specifically the status as "custodian of a child."

50.     "Adequate self support" and "reasonable needs" are both meaningless and unhelpful rubrics.

51.     Various rationales for spousal maintenance can be surmised, and the statute opens the door to multiple rationales, but each of them would require a different amount of spousal maintenance in any given case. If, for example, the awarding judge should aim simply to prevent the receiving spouse from becoming a dependent of the State, that would require a different award than if the judge should instead aspire to roughly equalize the post- divorce incomes of the two parties.  A different award would be required if the goal of spousal maintenance is to enable the receiving party to live in a manner equal to that enjoyed during the

9

marriage. A third and different amount might be appropriate if the purpose of spousal maintenance is to punish behavior like adultery or spousal abuse. A still different award would be called for if the purpose of spousal maintenance were to compensate one spouse for financial or other contributions made to enable the paying spouse to obtain a college or professional degree. And yet a different award would be proper if the purpose is to provide a transitional period during which the receiving spouse seeks to rejoin the workforce after the divorce and ultimately becomes employed.

52.     As stated above, the Minnesota spousal maintenance regime states that a purpose of spousal maintenance is "to provide for the reasonable needs of the spouse considering the standard of living established during the marriage." Minn. Stat. § 518.552 Subd. 1(a).

53.     Nonetheless, it is impossible to know, even generally, if any award is warranted in any specific case, and, if so, what the terms of the award (size and duration) should be.

54.     This language impermissibly vests enormous discretion in the hands of the trial judge.

55.     In setting spousal maintenance awards, Minnesota requires trial judges to consider "all relevant factors," but provides no quantitative guidance to them on that question. If a trial judge concludes that it would be "desirable" and "feasible" for a custodial parent to stay at home full time, the court may increase the spousal maintenance award to that party on that basis. No statute identifies quantitative considerations, algorithms, or guidelines that a court should consider in deciding whether it is more "desirable" and "feasible" for a child to have a stay-at-home parent or the increased family income that would result if that parent were employed outside the home.

56.     Because no statute informs the trial court of any ascertainable method in awarding spousal maintenance, meaningful appellate review of a spousal maintenance

award is impossible.

    c.    <u>Minnesota Has Failed to Adopt Guidelines for Spousal Maintenance Awards, As it Has Done for Child Support Awards</u>

57.    In the 1980's, Minnesota adopted guidelines for trial judges to use in awarding child support in divorce cases.  Minnesota now requires trial courts to consider these guidelines.  Minn. Stat. § 518.34. Minnesota adopted child support guidelines in partbecause it was required to do so to comply with federal law.

58.    The express purposes of the child support guidelines were to "provide uniform procedures for establishing" support levels, "to make awards more equitable by ensuring the consistent treatment of persons," and to "promot[e] settlements . . . by giving . . . the parties guidance."

59.    No similar guidelines exist for spousal maintenance awards.

60.    The child support guidelines have materially reduced the randomness and lawlessness that previously marked such awards, and which continue to plague spousal maintenance awards.

61.    On information and belief, Minnesota maintains no records concerning, and it is impossible to know (a) how many awards of spousal maintenance are in effect today or at any time; (b) what percentage of divorce judgments include spousal maintenance awards; (c) what percentage of spousal maintenance awards do and do not have durational limits; or (d) what is the average or median length of those spousal maintenance awards that do have durational limits.

62.    There are no reporting services that assemble decisions of Minnesota trial courts in divorce actions. There is no practical way for lawyers, litigants, judges, or legislators to assess whether (a) any pattern exists in cases with similar characteristics; or (b) whether recognizable variations exist in results in different parts of the State.

63.    No Minnesota appellate court has ever given the spousal maintenance statute a

limiting interpretation. Indeed, to the contrary, Minnesota courts appear to trumpet the vagueness

of the statute as its most commendable quality.

64.     It is impossible for any married person in Minnesota to know, even within a

reasonable range, what financial penalties will be imposed upon him in a divorce judgment.

65.   As one scholar has written:

> When a trial judge is told . . . that sixteen unweighted factors . . . should
> be considered, this is tantamount to <u>unlimited discretion</u>. Under this type
> of statute,litigants have no way to predict which factors will carry the day
> or what overall goals the judge will be striving to achieve. A list of
> factors with no indication of relative weight and no over-arching
> guideline other than the   admonition to be fair is virtually the same as
> providing no factors.

Mary Ann Glendon, "Fixed Rules and Discretion in Contemporary Family Law and Succession

Law," 60 <u>Tulane Law Review</u> 1165, 1195-96 (1986) (Emphasis added).

66.     Another scholar has similarly observed that the "statutory criteria are so broad,

idiosyncratic, or unclear in purpose or direction that they actually provide little practical

guidance for – or limitation upon – judicial discretion." The "statutory criteria provide no clear

direction as to whether spousal maintenance is intended to achieve spousal support, post

marital compensation, both objectives, or some other goal." As a result, courts "'look to a

hodgepodge of factors weighing them in an unspecified and unsystematic fashion,' making it

impossible for couples or their counsel to predict with any degree of certainty what the actual

spousal maintenance award might or should be." R. Collins, "The Theory of Marital Residuals;

Applying An Income Adjustment Calculus to the Enigma of Spousal Maintenance," 24

Harvard Women's L.J 23, 32-33 (2001).

67.     In 2007, the American Academy of Matrimonial Lawyers issued a report,

approved by its Board of Governors. The Academy concluded that current spousal maintenance

laws suffer from "a lack of consistency resulting in a perception of unfairness," and that this lack

of "predictability undermines confidence in the judicial system and further acts as an

impediment to the settlement of cases because without a reliable method of prediction, clients

are in a quandary." The Academy made several recommendations, including imposing limits on

the duration of spousal maintenance awards based on the length of the marriage.

68.     The Academy did not, however, identify any rationale for spousal maintenance

in the first place.  Indeed, the Academy noted that "[w]ith the advent of no-fault divorce, spousal

maintenance lost its punitive rationale." The report observed that multiple theoretical rationales

might exist for spousal maintenance, but that no one knew which one(s) to apply. "[N]eed

remains an elusive concept. Is itthe marital standard of living? Is it subsistence level?  Is it a

transfer of money to provide income sufficient to acquire skills or training to become self-

supporting?" The report decried "troubling . . . tendencies to see very disparate results within

jurisdictions where the judges are supposedly applying the same statutes."

69.     Other professional bodies have voiced similar criticisms. In 2006, the Family

Law Section of the Ohio State Bar Association issued a formal report in which it concluded as

follows:

> [B]ecause of the wide discretion granted to courts on this subject [spousal
> maintenance], thereis an enormous disparity among judges and magistrates in the
> application of [the statute] to cases involving similar facts throughout all 88
> counties. Consequently,it is very difficult for trial attorneys to give their clients
> predictable and reliable advice on this subject, or to negotiate fair settlements
> (Emphasis added).

The report recommended adoption of a series of presumptions and guidelines concerning

the amount spousal maintenance and its duration.

70.     In 2001, the American Law Institute issued its "Principles of the Law of Family

Dissolution," in which it stressed the two fundamental and critical flaws in the policy and logic

underlying spousal maintenance schemes such as Minnesota's:

> There is first the failure to provide any satisfactory explanation for placing the
> obligation to support needy individuals on their former spouses rather than on
> their parents, their children, their friends, or society in general. The absence of

13

any explanation for requiring an individual to meet the needs of a former spouse leads inevitably to the second problem, the law's historic inability to provide any consistent principle for determining when, and to what extent, a former spouse is "in need." <u>We cannot choose among the many possible definitions of need if we do not know the reason for imposing the obligation to meet it</u>. Some judicial opinions find the spousal maintenance claimant in "need" only if unable to provide for her basic necessities, others if the claimant is unable to support himself at a moderate middle-class level, and still others whenever the claimant is unable to sustain the living standard enjoyed during the marriage even if it was lavish.  (Emphasis added).

71.     In no other area of law is the judiciary cast adrift and empowered to force the transfer a private citizen's assets with no stated goal against which to measure the appropriateness of the award.  For example, in a breach of contract action, the court is to require a responsible defendant to pay to the victim a sum of money sufficient to put him in as good a position as he would have been had the breach not occurred. But the court is not free to award any more than that, even if the plaintiff "needs" it and even if it would be "desirable" and "feasible." In a personal injury action, the court is to award the victim a sum of money sufficient to compensate the victim for his lost earning power and his pain and suffering.  Even when a court is awarding punitive damages, whose purpose is to punish and deter, the fourteenth amendment to the Constitution of the United States places limits on the amount of such damages, which generally must not be more than 10 times the amount of the victim's actual damages. These sorts of rules make possible meaningful appellate review of damages awards for excessiveness, and prevent trial judges from simply inventing random, freakish awards based on absolutely unfettered discretion.

72.     Another scholar expressed similar conclusions in 1991:

Broad discretion [for judges] in family law decision making is detrimental to the judicial system and to the parties seeking to resolve disputes. Vesting judges with such discretion does not enhance their ability to make just decisions; instead, it <u>jeopardizes fundamental rights</u> of parents and children. <u>Vague</u>, indeterminate standards also tend to support the perception of both men and women that judicial decisions in this area are <u>arbitrary</u> or discriminate against them on the basis of their sex. Further, lack of predictability that flows from <u>broad, undefined</u> standards discourages divorcing parents from settling their disputes on equitable

14

terms. As a result, the resources of both the judiciary and the litigants are wasted at a time when both are critically scarce.

\* \* \*

Both men and women . . . increasingly perceive that some of the most important decisions of their lives will be made for them in an inequitable way. . .  [I]t is almost universally thought that in awarding spousal maintenance, domestic courts behave in a <u>high handed, arbitrary and unjust</u> way.

Jane C. Murphy, "Eroding the Myth of Discretionary Justice in Family Law: The Child Support Experiment," 70 <u>North Carolina Law Review</u> 209, 201, 221-22 (Nov 1991) (Emphasis added).

   D. <u>Spousal Maintenance Is a Historical Anachronism, a Remnant of an Earlier Era of Legal Relations</u>

   73.    It is not possible to appreciate the anachronistic nature of Minnesota's spousal maintenance scheme without understanding the historical context from which it originated.

   74.    At common law, once a woman married, her legal status was governed by a doctrine known as "coverture."  In his Commentaries, published in 1809, Blackstone explained the doctrine as follows:

By marriage, the husband and wife are one person in law; that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs everything; and is therefore . . . under the protection and influence of her husband, her baron, or lord: and her condition during her marriage is called her coverture.

   75.    If a woman owned property before the marriage, ownership passed to the husband upon the marriage.

   76.    The Supreme Court of Connecticut, writing in 1906, described the legal rights of married women at common law as follows:

[B]y force of the marriage her personal freedom was subjected to the will or control of the husband. Until the reign of Charles II, the right of a husband to correct his wife was recognized . . . and until comparatively recent times the right of the husband to restrain the person of his wife by confinement, for the purpose of securing her obedience, was recognized.

77.     Women were long barred from many professions, a bar the Supreme Court of the

United States found constitutional as late as 1873:

> The natural and proper timidity and delicacy which belongs to the female sex
> evidently unfits it for many of the occupations of civil life.  The constitution of
> the family organization, which is founded in the divine ordinance, as well as in
> the nature of things, indicates the domestic sphere as that which properly belongs
> to the domain and functions of womanhood .........The paramount destiny and
> mission of woman are to fulfill the noble and benign offices of wife and mother.
> This is the law of the creator.

_Bradwell v. Illinois_, 83 U.S. 130, 141 (1873) (Bradley, J.).

78.     It was not until Minnesota's enactment of the Married Women's Act of 1869

that Minnesota wives were first granted the right, after marriage, to retain their legal identity,

including their capacity to acquire and own property, make contracts, sue and be sued.

79.     At common law, a husband had a legal obligation to support his wife, referred to

as the "doctrine of necessities." Under this rule, the husband was legally required to provide his

wife with the basic material goods of life. This one-way obligation was codified by statute in

Minnesota until 1981.  Until then, there was no reciprocal obligation of support.

80.     In England, before American Independence, the only kind of

"divorce" available to the vast majority of citizens was not an "absolute divorce"

(which is what we now call a divorce), but a "divorce from bed and board," which

was granted only by ecclesiastical courts. This permitted a married woman to live

apart from her husband, which under ordinary circumstances would have been

unlawful for her to do. She remained, however, legally married to her husband. He

therefore retained his legal obligation to provide for her, under the commonlaw

"doctrine of necessities." Spousal maintenance was the way this obligation was

fulfilled. In these instances, however, spousal maintenance was not a post-divorce

remedy as it is under current law. Rather, it was simply intended to ensure that a

husband continued to fulfill his existing legal obligation to support his wife, to

whom he remained married but living apart. The word "spousal maintenance"

derives from the Latin "alimonia," which means "sustenance."

     81.    The historical practice of awarding spousal maintenance now lacks

any theoretical justification.  As one scholar has observed:

> In the United States, spousal maintenance was derived from the spousal duty of
> support as it developed historically in England. Spousal maintenance was a
> remedy developed by the English ecclesiastical courts at a time when there was
> no such thing as a completedivorce--there was only, in effect, a legal separation.
> In a legal separation, the husband's legal duty of spousal support continued.
> Somehow this practice of awarding support to a woman still married but no
> longer living with her husband became part of the law in the United States, even
> though absolute divorce had long been permitted. As a result of its awkward
> history, <u>the theoretical basis for</u> alimony in this country has always been
> somewhat unclear, leading some to describe spousal maintenance as "a practice
> without a theory." In recent years, the institution of alimony has come under
> attack as legally unsupportable  . . . [A] s of now, <u>there is no commonly accepted</u>
> <u>legal theory that adequately explains why one</u> spouse should continue to have a
> <u>legal obligation to support the other after their</u> marriage has been legally
> <u>terminated.</u>

T. Perry, The "Essentials of Marriage"; Reconsidering the Duty of Support and Services,

15 <u>Yale J.L. & Feminism</u> 1, 23 (2003) (Emphasis added).

     1.    Another law professor has expressed similar views:

> If marital ties are fully severed, it is difficult to see how a husband's duty of
> support can survive. That spousal maintenance did not disappear with the
> appearance of absolute divorce, or with the supposed abandonment of coverture,
> is <u>a conceptual mystery</u>.

C. Starnes, "One More Time: Alimony, Intuition, and the Remarriage-Termination

Rule," 81 <u>Indiana L. J.</u> 971, 984 (2006) (Emphasis added).

     92.    Until recently, Minnesota's spousal maintenance scheme only permitted the

award of spousal maintenance to wives, never to husbands. This reflected, in the words of the

Supreme Court of the United States, the "old notion" that "it is the man's primary responsibility

to provide a home and its essentials."  In 1979, the United States Supreme Court declared such

statutes unconstitutional.

93.     Notwithstanding the change in statutory language, Minnesota courts rarely if ever award spousal maintenance to husbands.  Only 3% of spousal maintenance recipients nationwide are men.

94.     Federal statutory law has prohibited discrimination in hiring or promotion by employers on the basis of sex since 1964. The Constitution of the State of Minnesota has prohibited discrimination on the basis of sex since 1967. In 1971, the Supreme Court of the United States held for the first time that the Equal Protection Clause of the 14th Amendment applied to distinctions based on sex. In 1976, that Court ruled for the first time that such distinctions were subject to a heightened standard of judicial scrutiny.

95.     The Minnesota spousal maintenance statute must also be subject to heightened scrutiny as it has created a chilling effect on the decisions of some Minnesota residents to marry or to divorce. The statute has created substantial interference with residents' decisions to enter or exitthe marital relationship.

96.     In 1920, only 9% of married American women were in the labor force.

97.     In both Minnesota and the United States today, women constitute approximately half of the labor force. Approximately 60% of all American women are in the labor force or are looking for work. The percentage is even higher in Minnesota. Over 70% of mothers with minor children nationwide are in the labor force.  In 2010, the unemployment rate for women was lower than it was for men. Almost one-third of businesses in Minnesota are owned by women.

98.     For at least a decade, women have been a majority of all college students, and now earn 40% of all science and engineering doctoral degrees. Women now account for a third of the nation's lawyers and doctors. For twenty-five years, approximately 45% of law students have been women; in the last decade that number has approached 50%.

99.     Women constitute one-third of the justices of the Supreme Court of the United States, one-fifth of all United States Senators, and one-tenth of all Governors. In recent years women have served as the Attorney General of the United States, the Secretary of State, the Ambassador to the United Nations, and the Speaker of the House of Representatives. While in the election of 1964, male voters outnumbered female voters nationwide by 1.7 million, by the election of 2004, 8.8 million more women voted then did men.

100.    Meanwhile, American women, who on average lived only 1 year longer than men in 1920, now live 5 to 8 years longer. American men are 50 times more likely to die in military combat than women; 4 times more likely to commit suicide; 12 times more likely to die at work; 4 times as likely to be diagnosed as HIV positive; 11 times more likely to be incarcerated; 50 times more likely to be sentenced to death if found guilty of capital crime; and 99 times more likely to be executed for committing a capital crime. Men are 85% of America's homeless persons. They are a majority of the victims of violent crime, a majority of high school dropouts, and a majority of sufferers of hypertension.  American men are more likely than women to suffer from alcoholism, ADHD, schizophrenia, and cancer. American men die at a higher rate than women at every age of life.

E.   Appellate Review of Spousal Maintenance Awards

101.    A divorcing spouse ordered to pay spousal maintenance may appeal the order to Minnesota's appellate court, but as a practical matter there is no purpose in doing so.

102.    The appellate court reviews orders awarding spousal maintenance under an abuse of discretion standard, engaging in "every reasonable presumption in favor of correctness" of the award. While that standard can and does provide for meaningful, if deferential, appellate review in some circumstances, its effect here is to make appellate review a charade.

103.    A spousal maintenance award will not be reversed unless the appellate court concludes that the lower court "could not reasonably conclude as it did, based on the facts presented."

104.    Because trial courts are not instructed which factors to weigh most heavily, and are given permission to give any weight, including no weight, to any factor, and to consider factors not expressly listed in the statute, it is impossible to imagine any scenario in which a trial court "could not reasonably conclude" that a given award was appropriate. For example, in two cases with identical facts, one judge might assign little or no weight to the defendant's adultery, while giving great weight to plaintiff's high income. Another judge might decide that those two factors should be weighted in the opposite manner. They could then enter wildly different spousal maintenance awards on identical facts. Yet no appellate court could reverse. Indeed, because trial courts are not required to explain what weight they assigned to any factor, it would be impossible to know why the two judges came to disparate conclusions, making appellate review inconceivable.

105.    If either the paying or receiving spouse appeals, the paying spouse may be ordered to pay the receiving spouse's attorneys' fees — in advance — in connection with the appeal, no matter who prevails on appeal.

106.    Then, even if an appealing spouse does prevail, the case is sent back down to the lower court where it is decided by the same judges who have awarded egregiously unreasonable awards in the first place, resulting in further appeals, expense and hardship to the aggrieved party.

F.  Post-Judgment Modification and Termination of Spousal Maintenance By Order of the Court

107.    At any time after the judgment, so long as the spousal maintenance award remains in effect, Minnesota permits a spousal maintenance payer or recipient to move the court

for an order reducing or increasing payments if its application is no longer reasonable or fair. Minn. Stat. § 518A.39.

108.     The court may increase the spousal maintenance award based on assets and income acquired by the payer after the divorce judgment, even if the payer acquired that property solely on the basis of his own labor, with no contribution or aid from his former spouse. The Minnesota Supreme Court has observed that the court is free to increase a spousal maintenance award years later if, for example, thepaying party receives an inheritance from a newly deceased relative.

109.     It is impossible for any divorced person subject to a Minnesota spousal maintenance judgment to know what effect his future financial success will have on the existing spousal maintenanceaward.

110.     In no other area of law may a court increase the amount of a civil money judgment (a) years after it is entered, or (b) based on facts that occurred post-judgment.

111.     The court may also order an increase in the term of a spousal maintenance award, creating perpetual uncertainty for the payer since an award may be modified to extend it beyond the originally ordered term.

112.     A spousal maintenance payer may not engage in self-help following a substantial change of circumstances. A payer who is fired or incapacitated may not simply stop paying or reduce his payments without a court order. Unless the spousal maintenance recipient agrees to a modification, the courtmust conduct an evidentiary hearing, in advance of which the spousal maintenance recipient is entitled to discovery and, perhaps, attorneys' fees.

113.     Even where the court has modified a spousal maintenance order due to substantial change of circumstances, it does not always consider all of the other existing financial orders causing hardship to the paying party.

21

G.  Minnesota Imprisons Persons Who Fail to Pay Spousal maintenance

114.    If a person ordered to pay spousal maintenance fails to do so, and the court determines he hasthe ability to do so, the court may find him in contempt, may impose monetary penalties, and may have him arrested and imprisoned.  Minn. Stat. § 588.02.

115.    The remedy of imprisonment is available whether or not the spousal maintenance recipient isemployed, and whether or not the payer's default has created any risk that the recipient might become dependent on the State.

116.    In no area of law other than family relations does Minnesota give a civil litigant the ability to use penal remedies to enforce a money judgment.

117.    The party in arrears may be held in contempt even if he lacks the ready cash to make the overdue payments. If the defaulting party has the practical ability to borrow enough money to pay the arrears, and has failed to do so, the court may find that his non-payment was willful and he may be imprisoned.

118.    A person from whom spousal maintenance is sought has no right to court-appointed counsel.

H.  Termination of Spousal Maintenance on Remarriage

119.    Most Minnesota spousal maintenance judgments expressly provide that the obligation shall terminate upon the remarriage or cohabitation of the receiving spouse.

120.    Ending spousal maintenance obligations upon the remarriage or cohabitation of the receiving party is not rationally related to any of the theoretically possible rationales for spousal maintenance. If the purpose of spousal maintenance is to maintain the receiving spouse's pre-divorce lifestyle, or to equalize the living standards of the divorced parties, or to punish a former spouse for his "fault," or to prevent the recipient from becoming dependent on the State, then terminating spousal maintenance merely because the receiving spouse

remarries or cohabits is not rationally related to any of those goals.

121.    Ending spousal maintenance obligations upon the remarriage or cohabitation of the receiving former spouse has the perverse consequence in some instances of dissuading persons otherwise eager to marry from doing so because they understand that their marriage will eliminate income currently flowing to one or both of them from former spouses.

122.    The provision of Minnesota law that provides for the termination of spousal maintenance upon the remarriage or cohabitation of the recipient is an anachronistic echo of the common law rule that a divorced wife's entitlement to support continued only so long as she remained "chaste and single."

123.    Presently, Mr. Petinga has a motion to terminate— or in the alternative: modify—spousal maintenance pending before District Court, in Hennepin County Minnesota.  Petinga's motion for termination is based on the fact that his ex-wife—Ms. Pluszcz— is and has been cohabitating with her fiancé, Mr. Cristofono, which is grounds for termination, per Minn. Stat. § 518.552 Subd. 6. Petinga's motion in the alternative for downward modification is based on Petinga's reduction in gross income in excess of 20%, per Minn. Stat. § 518A.39.

124.    To further explicate his pending motion, Mr. Petinga's ex-wife is voluntarily unemployed or underemployed—and has been since their 2016 dissolution. Further, Mr. Petinga's ex-wife is and has been engaged and not yet married for the ostensible sole purpose of continuing to collect support monies from Mr. Petinga.  At the time of their dissolution, in 2016, Mr. Petinga agreed to set his ex-wife's income at ($0) zero only to afford her time to "take the necessary steps to become recertified in one of the above-listed careers." These careers include "a few different fields including as a phlebotomist with Fairview Health Systems, as a veterinary technician, and as a certified

Pilates instructor." Yet, four years later, Ms. Pluszcz is still unemployed. Mr. Petinga

contends four years is sufficient and reasonable time for his ex-wife to recertify herself, or

seek other gainful employment.

125.    Ms. Pluszcz and her fiancé, Mr. Cristofono, attend school together, body

build together, model together, and defraud together (*see*: U.S. Bankruptcy Court File

Number 20-40994, wherein Mr. Cristofono has been sued by a former attorney,

coincidentally Ms. Pluszcz's former close friend, for fraud).

126.    Mr. Petinga argues, based on the above facts, Pluszcz and Cristofono are de

facto husband and wife avoiding the formality of marriage for the sole and singular

purpose of collecting Petinga's monthly support checks of $6,500.00.

127.    Neither Pluszcz nor Cristofono is gainfully employed.  Instead, Mr.

Petinga's $6500 monthly support checks enables them both to live seemingly

responsibility-free and litigate.

128.    While Pluszcz and Cristofono are unjustly enriched, Mr. Petinga—

historically a serial and successful entrepreneur— is in dire financial straits. In the last

year, Mr. Petinga's salary has decreased in excess of twenty (20) percent and his

businesses have incurred sizable debt.

129.    In addition, Petinga continues to battle the side effects of testicular

cancer. Since 2003, as part and parcel of ongoing cancer treatment, Petinga endures

surgery every eight weeks. To date, Petinga has undergone thirty-six (36) minor surgical

procedures and two (2) major surgical procedures.

130.    Petinga seeks fairness; he brings this action not out of greed or aim to

harass. Cancer simply does not allow for such.

131.    Instead, Petinga moves this Court in order to ensure his financial survival—and more importantly, the financial security of his three daughters.

132.    The vague spousal maintenance statute should be declared unconstitutional.

I.   No Right to A Jury Trial

133.    Minnesota's spousal maintenance scheme requires that numerous factual findings based on evidence must be made  before a decision can be made (a) whether to grant spousal maintenance at all, and (b) how much to grant and for what period of time.

134.    Minnesota does not grant divorcing parties a right to have a jury make these factual findings.

135.    In at least three States, North Carolina, Texas, and Georgia, divorcing spouses have the right to a jury trial.

J.   Attorneys' Fees in Minnesota Divorce Cases

136.    Minnesota law authorizes the court to award attorneys' fees to either spouse in a divorce action. The court can award fees to either the plaintiff or the defendant, either as a preliminary remedy before judgment, as part of the final judgment, in connection with post-judgment proceedings to modify the judgment, or in connection with an appeal. The court may award fees to either party, regardless of who prevailed, or is expected to prevail in the action.

137.    Thus, for example, if, ten years after the parties divorce, the spousal maintenance recipient moves for an order increasing the periodic payments, the court may, as a preliminary remedy before deciding the motion, order the payer to pay the recipient an extra sum to cover the recipient's attorney's fees. Even if the court ultimately concludes that the motion to modify should be denied, the court may permit the recipient to keep the attorney's fees award.

138.    In no other area of law does Minnesota permit a court to require a civil litigant

25

to pay for his adversary's legal fees, in advance, before any right to substantive relief has been established. In no other area of law does Minnesota permit a court to order a prevailing party to pay the attorneys' fees of the losing litigant.

**K.**   Divorce and Spousal Maintenance Laws Contribute to the Ongoing Marriage "Strike"

139.     In part as a result of Minnesota's statutes burdening a citizen's fundamental liberty interest in ending a marriage, significant numbers of citizens simply avoid marriage entirely.

140.     A material number of families in Minnesota consist of adults who are living together in intimate relationships, sharing assets and income, and sometimes raising children, but who are not married to each other and do not plan to marry each other.

141.     Nationwide, only 51% of adults are now married, as opposed to 72% in 1960.  In Minnesota, there were 26,000 marriages celebrated in 1990, but only 20,000 in 2009. There were 8 marriages celebrated per 1,000 Minnesota residents in 1990, but only 6 per 1,000 residents in 2009.

142.     A large plurality of children in the United States are now born to mothers who are not married to the child's biological father.  In 2010, that percentage was 40.8%.

143.     In 2003, 40% of cohabitating couples nationwide had minor children living with them.

144.     These phenomena are symptoms of the burden Minnesota places on citizens' decisions to end their marriages.

145.     By avoiding marriage, citizens escape from the provisions of Minnesota law that place them and their assets and income under the permanent and limitless authority of Minnesota's judiciary.

146.     If Minnesota residents cohabit and then separate, but never marry, Minnesota

does not grant the judiciary the power to award either party any portion of the other's future earnings.

147.    If parties cohabit and pool resources before marrying, and then divorcing, the time they lived together before marrying is not included when the court calculates the "length of the marriage" in setting spousal maintenance.

148.    If a wife abandons her husband, but does not divorce him, the husband's prior obligation to provide "reasonable support" to his wife ends. But if the husband chooses to divorce his absent wife, the court is free to award her spousal maintenance.

L.    Minnesota Imposes Spousal Maintenance In Divorces In Which It Has No Material Interest And OnPersons With Whom It Has No Connection

149.    Minnesota law empowers its courts to award spousal maintenance in connection with divorces as to which Minnesota has only the most ephemeral connection or interest.

150.    For example, Minnesota can impose spousal maintenance obligations on a divorcing spouse who does not live in Minnesota, has never lived in Minnesota, and will never live in Minnesota, so long as the recipient of the spousal maintenance lives in Minnesota for 6 months before the divorce judgment is issued, even if that receiving spouse has no intention to remain in Minnesota permanently. Given how long a contested divorce proceeding typically takes to get to judgment, this means that such a spousal maintenance recipient would not have to be a resident of Minnesota on the date that the complaint was filed.

151.    Minnesota law threatens the assets and income of Americans who have never set foot in Minnesota and could never have known that their fortune might be affected by Minnesota spousal maintenance law.

M.    Minnesota Has No Compelling Interest in Requiring People To Stay Married Or In Punishing Them Financially for Divorcing

152.    In recent decades, Minnesota has acknowledged its lack of interest in the intimate affairs or marital status of its residents by repealing or modifying a variety of its laws.

153.    For most of its history, Minnesota prohibited, and punished as a crime, some forms of conduct if and only if they were engaged in outside a marriage recognized as valid by Minnesota. For example, fornication and cohabitation could be prosecuted if the persons were not married. For most of Minnesota history, consensual sexual relations between adults of the same sex was a crime.

154.    In 2001, Minnesota repealed these criminal laws, out of recognition that the State had no interest in favoring one form of pair-bonding (heterosexual marriage) over other forms (unmarried cohabitation, extra-marital sexual relations, homosexual couples).

155.    For most of its history, Minnesota also used other powers of the State (other than criminal prosecution) to favor heterosexual marriage over all other forms of pair-bonding or sexual behavior. For example, Minnesota (a) did not grant inheritance rights (as against either the mother or the father) to children born to parents who were not married; (b) did not require parents to support children born to unmarried parents; and (c) did not grant inheritance rights to either member of an unmarried, cohabitating couple as against the other.

156.    Minnesota has in recent years repealed or otherwise changed these laws in recognition of the fact that the State has no interest in burdening the decisions of citizens to form families not based on marriage.

157.    In 1978, Minnesota enacted Minn. Stat. § 553.01, which abolished common law tort actions such as alienation of affection, breach of promise to marry, seduction, and criminal conversation.  This repeal reflected the State's acknowledgement that it had no interest in punishing people for causing or compensating victims of for causing romantic injury or damage to a marriage.

158.    Additional evidence of the lack of a State interest in spousal maintenance awards is found in Minnesota's decision in 1971 to allow unmarried persons to limit their post-marriage, post- divorce financial obligations to each other in pre-nuptial or ante-nuptial agreements. Following this statutory enactment, not only can divorcing spouses waive their right to spousal maintenance, but they can make that waiver years in advance, before they are even married.  Minn. Stat. § 519.11.

159.    Because common law deemed a married couple to be one person in the eyes of the law, a husband could not be convicted of the rape of his wife. Minnesota amended its penal statutes to make possible the criminal conviction of a husband for the rape of his wife.

160.    Similarly, at common law, a wife could not recover tort damages against her husband for any physical injuries she suffered at his hands. Minnesota no longer recognizes inter-spousal tort immunity, and so battered wives do have a financial remedy against abusive husbands.

161.    In a case where the spouses are unwilling to subject themselves to the lack of due process, and the potential infringement of First Amendment rights, they are forced to stay married against their will.

N.   Minnesota's Spousal Maintenance Scheme Is Not Necessary or Narrowly Tailored to Further An Intent In Providing for Minor Children

162.    Minnesota's spousal maintenance scheme is not necessary to promote the interest of the Statein the well-being of children, and in any event is not the most narrowly tailored means of achieving that interest.

163.    The State does not require custodial parents to accept spousal maintenance. The State does not limit spousal maintenance to parents of minor children. The State permits the court to award spousal maintenance to spouses who have no children or who have no children under age 20.

164.     Minnesota's interest in the welfare of minor children of divorce is addressed by other laws. Minnesota courts have the power to impose child support obligations on either parent before, during or after marriage. In the event of divorce, the court may order support untilthe child is age 20. Minnesota courts are empowered to punish, to the point of incarceration, parents who fail to meet child support obligations. The court also has the power to modify child support orders at any time if the best interests of the child require it. The court has the power to consider in a divorce judgment which parent will have primary physical custody of any minor children when the court divides the marital property, and to award a greater portion of the marital property, or all of it, to the custodial parent.

165.     Much like Sophie's Choice to pay either attorneys' fees or other courtordered obligations, Petinga and many others like him are forced to face contemptfor failure to comply with unreasonable orders in order to contribute to their children's future education, or at the least affording a proper home for the children for whom they share physical custody. The draconian financial orders have cost them their homes, which they are required to maintain for the benefit of their children.

O.   <u>Minnesota's Spousal Maintenance Scheme Is Not Necessary or Narrowly Tailored to Further an Interest in Preventing the Impoverishment of Divorced Spouses</u>

166.     Minnesota's spousal maintenance scheme is not necessary to promote the State's interest in preventing divorcing spouses from becoming dependent on the State, and in any event is not the most narrowly tailored means of achieving that interest.

167.     Minnesota courts can, when granting a divorce judgment, award all of the marital property to either spouse if necessary. This property award is not spousal maintenance.

168.     Minnesota courts can award child support to custodial parents of minors.

169.     Minnesota courts can require either divorcing spouse to maintain medical insurance for their minor children.

170.     Minnesota courts are not required to award spousal maintenance to a destitute spouse, particularly if the marriage was short, or the destitute spouse was, in the opinion of the court, thecause of the divorce.

171.     Minnesota courts are not empowered to award spousal maintenance to a destitute spouse who does not request it, or who waived it in a pre-nuptial agreement.

172.     If no spousal maintenance is awarded at the time of the judgment, spousal maintenance cannot be grantedin post-judgment proceedings, even if in the interim either spouse has become destitute.

173.     Minnesota's statutory scheme prohibits spousal maintenance to a divorced party once he or she remarries, whether or not the new spouse's assets and income are sufficient to replace the spousal maintenance award, or even to prevent the divorced spouse from becoming dependent on the State.

174.     Minnesota courts are empowered to award spousal maintenance even to divorcing spouses who would be wildly affluent without spousal maintenance.

175.     Under the current scheme, support-paying spouses are being impoverished by the awards being ordered granting ex-wives spousal maintenance and other financial benefits without consideration of the financial circumstances of the parties.

176.     Petinga has become impoverished by the current scheme to which he was subjected, regardless of the income or ability of his ex-wife to support herself or even to provide support to the husband. In an effort to avoid contempt and imprisonment, he is now being pursued by creditors for bills that he cannot pay and is consequently forced to consider bankruptcy as his only recourse – all as a result of these unrealistic, irrational awards granted

31

against him.

177.    Under a more equitable scheme, the divorced Plaintiff might have an opportunity to have their current awards reevaluated and modified in a manner that corrects the harsh burden that has been imposed on them thus far by judges who have not taken due consideration of the facts and circumstances in their cases.

P.    Minnesota's Spousal Maintenance Scheme Is Not Necessary to Further a Compelling State Interest in Preserving Marriage, Nor Is It Narrowly Tailored to Promote Any Such Interest

178.    Minnesota has no compelling interest in forcing people to remain married, in preventing them from becoming ineligible to remarry, in punishing them financially for divorcing, in burdening their wish to divorce, or generally in equalizing the affluence of its citizens.

179.    Minnesota has no compelling interest in burdening married persons who wish toend their marriages by imposing financial penalties for the exercise of that right, or in using the fact of a divorce as an occasion to exercise jurisdiction of indefinite duration over all income andproperty acquired by either spouse after the divorce.

180.    Minnesota has no compelling interest in favoring married couples over unmarried couples, in favoring married persons over divorced persons, or in imposing burdens on a couple's desire to end the relationship that are not imposed on unmarried couples.

181.    Minnesota's spousal maintenance scheme is not narrowly tailored to further the preservation of existing marriages (even if that were a compelling state interest). The spouse who seeks the divorce, whose conduct may be the cause of the breakdown of the marriage, may still be awardedspousal maintenance if she "needs" it, especially if the court decides it is "desirable" and "feasible" for her not to be employed.

182.    Because the overwhelming majority of spousal maintenance payers remarry,

spousal maintenance awards put an unfair burden on the payer's second marriages.

183.    Minnesota's spousal maintenance scheme is not even rationally related to any state interest inprotecting or encouraging marriage. Rather, spousal maintenance schemes like Minnesota's have had the opposite effect of discouraging citizens from marrying at all, whether or not they are in a committed relationship and whether or not they are raising children. The rate of births to women who are not married has increased dramatically, while the percentage of the population that is presently married or has ever been married has decreased significantly. Citizens now shun marriage rather than submit their fate to the permanent and boundless oversight of an untethered judiciary.

Q.   Minnesota's Legislature Has Failed to Address the Growing Spousal Maintenance Reform Movement by Sufficiently Amending the Statute

184.    Although there is an active reform movement in Minnesota to address these andother issues plaguing the statute, and there has been incremental movement by the legislature to address some of them, it has failed to adopt amendments that repair the egregious outcomes under the current spousal maintenance scheme.

185.    Specifically, the Minnesota legislature has failed to either recommend or pass guidelines for awarding spousal maintenance.

186.    As a result, Plaintiff and others remain subject to unfair and unreasonable outcomes no matter how many times they appeal, or move formodification of awards that they have no hope of maintaining.

**FIRST CLAIM FOR RELIEF**
(For a Declaratory Judgment Pursuant to 42 U.S.C. § 1983)

187.    Plaintiff repeats and realleges the paragraphs above as if fully setforth at length here.

188.    Section 1 of the Fourteenth Amendment to the United States Constitution

provides in pertinent part as follows: "No State shall . . . deprive any person of life, liberty, or property, without due process of law....... "

189.    The right to marry, the right to end a marriage, and the right to remarry are fundamental liberty interests.

190.    Citizens have a property interest in income they earn from their labor, and in preventing the State from forcing its reallocation to persons to whom the citizen no longer has any legal relationship.

191.    No state law may burden a fundamental right unless it is necessary to promote a compelling state interest and is the most narrowly drawn means of achieving that end.

192.    Minn. Stat. § 518.52 violates the FourteenthAmendment to the United States Constitution.

193.    Minn. Stat. § 518.52 burdens a fundamental liberty interest and property interests without due process of law and without a compelling state interest and are not the most narrowly tailored means to further any compelling interest.

194.    42 U.S.C. § 1983 provides in pertinent part as follows: "Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....... "

195.    Minnesota burdens the fundamental liberty interest in ending a marriage and in remarrying in numerous ways identified above, including but not limited to the following: awarding spousal maintenance without durational limit; awarding spousal maintenance for periods longer than the lengthof the parties' marriage; awarding spousal maintenance that is perpetually subject to increase -- reaching income earned after the end of the marriage;

34

awarding spousal maintenance to spouses who are employable;awarding spousal maintenance
that is expressly non-modifiable even if the paying spouse becomes unemployed, ill, or retired;
awarding spousal maintenance to spouses who are affluent as a result of the equitable division
of the marital property; awarding spousal maintenance in the unfettered and unguided
discretion of the court; awarding spousal maintenance without any statutory direction as to
what the purposeof spousal maintenance is; awarding spousal maintenance without an
opportunity for meaningful appellate review; awarding attorney's fees, even in connection with
successful post-divorce motions to terminate or reduce spousal maintenance, and obliging
parties to make public the most intimate secrets of sexual, medical, professional and financial
lives to litigate a divorce case.

196.     These burdens are not necessary to further any compelling state interest.

197.     Minnesota's statutory scheme is not the most narrowly tailored means of
achieving any compelling state interest.

198.     Far from being the most narrowly tailored means to further a compelling state
interest, Minnesota's spousal maintenance scheme is intellectually bankrupt, an incoherent
hodge-podge in a fruitless search for a rationale. It is a mischievous invitation to judges to
impose their religiousviews, personal notions of morality, and ill-conceived theories of
redistributive justice on citizens seeking to exercise a fundamental liberty.

199.     As one appellate judge has observed:

In my opinion, the time has arrived to squarely face the questions and problems of
the doctrine of spousal maintenance. If society in the past garnered any benefit
from this antiquated system of private (versus public) welfare, such is either
nonexistent in this day and age or at the least is far outweighed by the
antagonisms, social dislocations, economic burdens and judicial inefficiency
which are involved and result from the perpetuation of the doctrine...Somehow
the legitimate interest of society in preventing divorcees (unable as contrasted to
unwilling to work) from being cast upon the relief rolls has been perverted into an
instrument to level economic disparities, both real and imagined, between two
people in which thereexists no legal relationship.

Olsen v. Olsen, 557 P.2d 604, 608, 612 (Idaho 1976) (Shepard, J., dissenting) (Emphasis added).

## SECOND CLAIM FOR RELIEF
(For a Declaratory Judgment Pursuant to 42  U.S.C. § 1983)

200.    Plaintiff repeats and realleges the paragraphs above as if fully setforth at

length here.

201.    Minnesota's spousal maintenance scheme inhibits constitutionally protected

activity.

202.    A statute empowering a state to deny a citizen a liberty or property interest is void

unless it is sufficiently clear that a person of average intelligence will be able to conform his

conduct to the law to avoid a loss of liberty or property.

203.    Minnesota's spousal maintenance scheme, including Minn. Stat. § 518.52,

does not satisfy that test.

204.    In addition, Minnesota's spousal maintenance scheme impermissibly delegates

basic policy matters to judges for resolution on an ad hoc and subjective basis. Because the

legislature has not told courts why or when to award spousal maintenance, spousal

maintenance awards are essentially random depending on what goal an individual judge

believes is desirable.

205.    Minnesota's spousal maintenance scheme does not provide notice to any person

anticipating either marriage or divorce (a) under what circumstances the court will impose

spousal maintenance, (b) what limits if any there may be on the size of the award, or (c) what the

duration of the award may be. Indeed, because the court may amend modifiable awards at any

time when both spouses are aliveand the receiving spouse has not remarried, even persons who

are already divorced are given no notice of what limits there may be on future awards.  Even

when the original award provides for a durational limit, the court retains power to extend that

limit by future order.

206.     Minnesota spousal maintenance awards need not and typically do not bear any relationship to any harm allegedly caused by the paying party to the other. No Minnesota statute requires courts to award spousal maintenance on that basis.

207.     The Minnesota Supreme Court has repeatedly declined opportunities to issue opinions limiting the scope or meaning of Minnesota's spousal maintenance scheme.

208.     Minnesota's spousal maintenance scheme purports to set a rule or standard, but is so indefinite and vague as to really be no rule or standard at all.

209.     Minnesota's spousal maintenance scheme provides an insufficient record on appeal where it does not require a full explanation of the award other than for awards terminating at death or remarriage of the recipient.  There are no instances where the parties being divorced can know what the outcome will be of a request for spousal maintenance. There is always a risk that the judge will apply the statute in an unconstitutional manner.

### THIRD CLAIM FOR RELIEF
#### (For a Declaratory Judgment Pursuant to 42 U.S.C. § 1983)

210.     Plaintiff repeat and realleges paragraphs above as if fully set forth at length here.

211.     Minn. Stat. § 518.52 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by empowering courts to order civil litigants to pay their adversaries' legal fees (a) when the payer is the prevailing party; (b) in post-judgment proceedings when the litigants are no longer married; (c) in preliminary proceedings when the court has yet to hear any evidence; or (d) when the non-paying litigant is not indigent.

WHEREFORE, Plaintiff respectfully demand judgment in his favor and against defendant as follows:

1)     Declaring Minn. Stat. § 518.52 unconstitutional and void.

2)     Declaring that any amended statute should require a clear explanation of any

37

award granted.

3)      Declaring that imprisonment is not an option for the court to impose when finding

contempt for failure to comply with financial awards against a party where a motion for

modification or an appeal has been filed.

4)      Awarding Plaintiff his attorneys' fees pursuant to 42 U.S.C. § 1988.

5)      Granting Plaintiff such other, further, or different relief as this Court deems just

and proper.

Dated:  March 17, 2021

MCLAUGHLIN LAW LLC

By:      /s/ Ryan McLaughlin
         Ryan McLaughlin, Esq.
         MN # 394780

         PO Box 25922
         Woodbury, MN 55125
         Phone: (763) 316-8323
         mclaughlinlawllc@gmail.com
         Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2021 a copy of foregoing COMPLAINT was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

MCLAUGHLIN LAW LLC

By:___/s/ Ryan McLaughlin_____
    Ryan McLaughlin, Esq.
    MN # 394780

PO Box 25922
Woodbury, MN 55125
Phone: (763) 316-8323
mclaughlinlawllc@gmail.com
Attorneys for Plaintiff